# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 15, 2011

## STATE OF TENNESSEE v. EUGENE TAYLOR

### Appeal from the Criminal Court for Hamilton County
### No. 270682      Don W. Poole, Judge

### No. E2010-01817-CCA-R3-CD - Filed May 20, 2011

The Defendant, Eugene Taylor, entered a plea of guilty to possession of cocaine for resale and possession of a firearm during the commission of a felony. Under the terms of the plea agreement, the Defendant received concurrent terms of four years as a Range I, standard offender for these convictions. As part of the plea agreement, the Defendant reserved a certified question of law challenging the trial court's denial of his motion to suppress the evidence resulting from his traffic stop. After our review, we affirm the judgments of the Hamilton County Criminal Court. We remand for the entry of a corrected judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed; Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Ardena Garth, District Public Defender and Richard Kenneth Mabee, Assistant Public Defender, Chattanooga, Tennessee, for the appellant, Eugene Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William H. Cox, III, District Attorney General; and Darren Gibson, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

The facts are not in dispute. Officer William Curvin testified that he had been employed with the Chattanooga Police Department since December 2000 and that he was on duty the evening of November 7, 2008. He explained that he was a part of the Narcotics Division's Highway Interdiction Team, primarily focusing on crimes occurring on the interstate and highways such as trafficking, drugs, guns, money, people, stolen cars, and fugitives. His training included "on-the-job" training, a one-week class on drug interdiction, an advanced auto theft class, and an interrogation and interview technique class. As a result of his training, he had learned to recognized suspect body language and other indicia of suspicious behaviors.

On the evening in question, Officer Curvin observed a blue Pontiac, being driven by the Defendant, traveling North at a high rate of speed on Interstate 75. The vehicle had Ohio tags and tinted windows, so Officer Curvin was unable to see the driver. Believing that the Defendant was speeding, Officer Curvin caught up with the car and paced it. As he was pacing the Pontiac with his car somewhere between seventy and seventy-two miles an hour in a fifty-five-mile-per-hour zone, he turned on his "moving radar" and verified the Defendant's speed at seventy miles per hour. He confirmed that the Defendant was speeding at 8:27 p.m. At 8:29 p.m., Officer Curvin initiated a traffic stop.

The Defendant pulled over in a "really wide place," where there was ample room for the Defendant to safely pull off the road. However, the Defendant parked the vehicle on the white line of the roadway, so that, in order to approach the driver's side of the car, Officer Curvin would have to walk into oncoming traffic. Officer Curvin testified that he sees this maneuver "quite often," that this is a really good indicator someone is "trying to hide something or trying to keep you away from their side of the door," and that this makes it easier to drive off quickly.

Officer Curvin approached the passenger's side of the car at 8:32 p.m. Immediately upon reaching the vehicle, Officer Curvin smelled a strong odor of alcohol. Officer Curvin informed the Defendant that he was being stopped for speeding. The Defendant was extremely apologetic and cooperative, talking and gesturing with his hands a lot. According to Officer Curvin, the Defendant seemed more nervous than what was typical for a routine traffic stop. This nervous behavior was another indicator of "possible suspicious activity." Officer Curvin noticed that the passenger of the vehicle, Eddie Cherry, who stated he had been drinking, would not make eye contact with him, staring "strictly at the glove box." Based on his training, this conduct caused Officer Curvin to suspect that some contraband was inside the glove box.

Officer Curvin then asked the Defendant about his driver's license. The Defendant handed Officer Curvin a rental agreement for the vehicle. Officer Curvin was surprised that it was a rental car because the car had tinted windows, which was odd for a rental car, and looked like it was being lived in due to the many fast food wrappers and cups inside the vehicle. According to Officer Curvin, in his experience, people who are trafficking some type of contraband, usually drugs, often live in their car: "The idea is if I stay in my car, basically live in my car, I can be sure that the stuff in my car is not going to be messed with."

Officer Curvin returned to his vehicle to perform a records check on the Defendant. He noticed that the car was supposed to have been returned to Enterprise Rent-A-Car that day at noon, but it was already 8:38 p.m. The car had not been reported as stolen at that time; however, Officer Curvin had experienced criminals using rental cars in the commission of various crimes and simply not returning them.

Officer Curvin walked back to the Defendant's vehicle and asked the Defendant to step out of the car. He wanted to separate the Defendant from the passenger to determine if the Defendant had been drinking as well. Officer Curvin talked with the Defendant for a minute and had the Defendant blow in his general direction; Officer Curvin did not smell any alcohol on the Defendant, and his eyes did not appear bloodshot. However, the Defendant was "still real fidgety, little nervous, moved around a lot, a lot of hand gestures." Officer Curvin began to write the Defendant a warning ticket for speeding,[1] when he noticed that the Defendant had "just got his license back on May 13th, so he hadn't had it long." Officer Curvin made a statement about the date on the Defendant's license, and the Defendant responded that he had just been released from lockup because he "got violated on a dirty urine test." When Officer Curvin then inquired about the rental agreement, the Defendant stated he had gotten an extension on the rental. The Defendant appeared very anxious and wanted "to get back on the road."

Officer Curvin explained to the Defendant that he was suspicious of his behavior and that he wanted to search the Defendant's car. When the Defendant was asked "if he had anything in the car that he was worried about," he said "no." Officer Curvin told the Defendant that he would treat the Defendant leniently if the only contraband in the vehicle was a weapon. Officer Curvin then asked for permission to search the vehicle, and the Defendant answered affirmatively. Officer Curvin did not use a consent form, and he did not recall if he had advised the Defendant that he had a right to refuse the search, however, it was his usual practice to do so. If the Defendant refused consent, Officer Curvin intended to further detain the Defendant and call for a canine officer.

---

[1] Officer Curvin could not recall whether he actually issued the Defendant a warning ticket.

After giving his consent to search, the Defendant attempted to return to his car, and Officer Curvin stopped the Defendant because he believed that he might have been returning to the car "to get a weapon or try to destroy something." The Defendant stated that he was only going back to get the keys. Officer Curvin again asked the Defendant about having a gun inside the car and, after a long pause during which the Defendant averted his eyes, the Defendant said "no." According to Officer Curvin, the Defendant's hesitation in answering the question was a suspicious sign, indicating that the Defendant was thinking about how to answer the question. Officer Curvin then asked the Defendant if he had any drugs in the car, listing certain drugs, and the Defendant responded "no."

Just to be certain, Officer Curvin again asked for the Defendant's consent to search the vehicle. The Defendant appeared extremely nervous, but answered in the affirmative. The Defendant then blurted out that he did have a gun in the car and told Officer Curvin it was in the glove box. At this point, the Defendant tried to walk back to the car again, and Officer Curvin stopped him once more. Officer Curvin inquired of the Defendant if he was a convicted felon or if he had a permit to carry the weapon, and the Defendant said "no" to both questions. Officer Curvin then placed the Defendant in the back of his patrol car; the Defendant was not handcuffed. At 8:45 p.m., Officer Curvin called for backup, which was approximately eighteen minutes after he observed the Defendant speeding and thirteen minutes from when he first approached the vehicle. In Officer Curvin's experience, this was not an "extraordinary long time" for a traffic stop.

Officer Curvin's supervisor arrived on the scene, and they got the passenger (Mr. Cherry) out of the vehicle. Mr. Cherry was very intoxicated and was "about to fall down." Officer Curvin assisted Mr. Cherry in walking to the patrol car and leaned him against the car. Officer Curvin then went to retrieve the gun from the glove box; inside a Crown Royal Bag, he found a loaded Smith & Wesson .38 caliber pistol, three extra bullets, and a razor blade. Based upon his experience, Officer Curvin knew that razor blades were used to cut crack cocaine. Officer Curvin then moved the vehicle out of traffic and, when he was opening the driver-side door, he found a bag of crack cocaine stuck in the "doorjamb." The crack cocaine was packaged in a "clear plastic baggie," and "it looked like there was part of . . . [a] cookie, . . . a large piece and then smaller pieces that had been broken up." The weight of the bag was later determined to be 13.1 grams. Continuing to search, Officer Curvin found eight gallons of "moonshine" in the trunk.

After finding the crack cocaine, Officer Curvin returned to his patrol car and handcuffed the Defendant and searched him, charging him with possession of cocaine for resale, possession and transportation of illegal liquor across state lines, possession of a firearm, and speeding. Officer Curvin arrested Mr. Cherry for public intoxication.

-4-

All of these events were apparently captured on video by a camera in Officer Curvin's patrol car. The transcript provides that a copy of the video was entered as Exhibit 1. The video of the traffic stop is not included in the record on appeal.[2]

On January 14, 2009, a four-count indictment was filed against the Defendant, charging him with possession of cocaine for resale, speeding, illegally transporting an alcoholic beverage, and possession of a firearm during the commission of a felony. See Tenn. Code Ann. §§ 39-17-417(a), 39-17-703, 39-17-1324(a), & 55-8-152. The Defendant filed a motion to suppress the evidence, seeking to suppress all evidence obtained as a result of the November 7, 2008 traffic stop. Relying on State v. Joshua Caleb Simmons, No. M2008-00107-CCA-R3-CD, 2009 WL 2391403 (Tenn. Crim. App., Nashville, Aug. 5, 2009) (concluding that a defendant's nervous behavior, accompanied only by an officer's knowledge of the defendant's prior criminal history, was not sufficient to create reasonable suspicion necessary to expand the scope of a traffic stop), and State v. Kevon Fly, No. E2006-01979-CCA-R3-CD, 2007 WL 2141543 (Tenn. Crim. App., Knoxville, July 26, 2007) (concluding that there was nothing improper about scope or duration of the detention where questions by officer revealed that, although defendant had been issued a valid driver's license, he did not have it with him at the time of the stop), the Defendant argued that the scope of his detention following the traffic stop was exceeded by Officer Curvin, without reasonable suspicion and, therefore, his consent was not voluntary.

A motion to suppress hearing was held on August 24, 2009. In the written order that followed, the trial court concluded that the subsequent expansion of the scope of the stop was reasonable, reasoning as follows:

> For any prolongation of the stop to separate the [D]efendant from the very strong odor of alcohol in the vehicle and assess his sobriety, there was reasonable, articulable suspicion: the very strong odor of alcohol. In any event, an officer may even request a motorist to exit his vehicle as a matter of course. See State v. Berrios, 235 S.W.3d 99, 106 (Tenn. 2007) (citing and describing Pennsylvania v. Mimms, 434 U.S. 106, 109-11 (1977)). Apparently, once the [D]efendant was away from the vehicle, the officer was quickly able to ascertain his sobriety. Likewise, for the officer's subsequent

---

[2] In the appellate record, there is a letter from defense counsel. He notes that, on the Certificate of Appellate Record signed by the trial court clerk, the DVD is not listed as having been transmitted to this Court with the transcript or the Technical Record. He inquired about the DVD with the court reporter, the public defender who handled the case, the assistant district attorney that handled the case, the district attorney's investigator, and the trial judge, but was still not able to locate it. He further states that the public defender's investigator tried to contact Officer Curvin to see if he had the DVD but, as of that time, he had received no answer. Defense counsel then pledged to supplement the record if the DVD was found.

investigation of the apparent expiration of the rental agreement, there was reasonable, articulable suspicion: the apparent expiration of the agreement.

As for the officer's investigation of the presence of a weapon or contraband in the vehicle, his reasons for suspicion were several:

> (1) the position of the [D]efendant's vehicle on the shoulder of the road;
> (2) the [D]efendant's nervousness and talkativeness;
> (3) the passenger's failure to make eye contact;
> (4) the condition of the interior of the vehicle;
> (5) the expiration of the rental agreement;
> (6) the [D]efendant's admission of a positive urine test;
> (7) the [D]efendant's long pause in response to the officer's second question about the presence of a gun in the vehicle and admission that there was a gun in the glove box; and
> (8) the issuance of the [D]efendant's driver's license during or immediately after his imprisonment for a drug offense.

Apparently, for the most part, although the questions and requests for consent to search did represent an expansion of the scope of the stop, they were contemporaneous with the preparation of the citation and therefore did not prolong the stop beyond the time necessary to investigate the traffic offense. Although the officer did prevent the [D]efendant from returning to the vehicle after obtaining his initial consent to search, the officer's repetition of the question regarding the gun seems to the [c]ourt a reasonable precaution in the circumstances and not an unreasonable intrusion. Thereafter, that is, after the [D]efendant's admissions regarding the urine test and the gun in the glove box, it was reasonable for the officer to prolong the detention to ensure his own safety and act upon the [D]efendant's initial consent to search.

The motion to suppress was denied. On October 14, 2009, the Defendant filed a motion requesting the trial court to reconsider its ruling.[3]

Thereafter, the Defendant entered into a negotiated plea agreement under Rule 11 of the Tennessee Rules of Criminal Procedure, in which he pleaded guilty to attempted possession of cocaine for resale, a Class C felony, and possession of a firearm during the commission of a felony, a Class D felony. See Tenn. Code Ann. §§ 39-12-101, -12-107, -17-

---

[3] No disposition of this motion is apparent from the record.

417(c)(1), -17-1324(g)(1). Pursuant to the terms of the agreement, he received a sentence of four years at 30% for each conviction; those sentences to be served concurrently in the Department of Correction, and a fine of $2,000.00.[4] The charges of speeding and illegal transportation of alcoholic beverages were dismissed. The plea was accepted by the trial court on July 28, 2010.

As part of his plea, the Defendant, pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure, reserved the right to appeal a certified question of law dispositive of the case. The respective judgment of conviction forms contained the following notation within the special conditions section: "See Judgment (Page 2) attached, reserving a certified question of law." On "Page 2," which is signed by both parties and the trial judge, the Defendant reserved the following question: "Whether there was a reasonable, articulable suspicion sufficient to warrant the expansion of the scope of the traffic stop of the [D]efendant and whether the [D]efendant's consent to search, which was verbal, was part of the unwarranted detention." The Defendant filed a timely notice of appeal.

**Analysis**

Tennessee Rules of Criminal Procedure 37(b)(2)(A) provides that a defendant may appeal from any judgment of conviction on a plea of guilty or nolo contendere, if:

> (A) the defendant entered into a plea agreement under Rule 11(a)(3) but explicitly reserved—with the consent of the state and of the court—the right to appeal a certified question of law that is dispositive of the case, and the following requirements are met:
>
> (i) [T]he judgment of conviction or other document to which such judgment refers that is filed before the notice of appeal, contains a statement of the certified question of law that the defendant reserved for appellate review;
>
> (ii) [T]he question of law is stated in the judgment or document so as to identify clearly the scope and limits of the legal issue reserved;
>
> (iii) [T]he judgment or document reflects that the certified question was expressly reserved with the consent of the state and the trial court; and

---

[4] The fine is not entered on the judgment of conviction. We remand to the trial court solely for the entry of a corrected judgment on the possession of cocaine for resale conviction to reflect the fine imposed.

(iv) [T]he judgment or document reflects that the defendant, the state, and the trial court are of the opinion that the certified question is dispositive of the case[.]

See also State v. Armstrong, 126 S.W.3d 908, 912 (Tenn. 2003); State v. Pendergrass, 937 S.W.2d 834, 836-37 (Tenn. 1996); State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988). The burden is on the defendant to see that these prerequisites are in the final order and that the record brought to the appellate court contains all of the proceedings below that bear upon whether the certified question of law is dispositive and the merits of the question certified. Pendergrass, 937 S.W.2d at 837.

The Defendant's reservation of the certified question is noted on the judgment forms: "See Judgment (Page 2) attached, reserving certified question of law." On "Page 2," the certified question is clearly identified and signed by the State, the Defendant, and the trial court. Finally, the certified question is dispositive of this case. A dispositive issue is one where the "appellate court 'must either affirm the judgment or reverse and dismiss.'" State v. Walton, 41 S.W.3d 75, 96 (Tenn. 2001) (quoting State v. Wilkes, 684 S.W.2d 663, 667 (Tenn. Crim. App. 1984)).

The Defendant contends that the stop was prolonged longer than necessary to process the traffic violation without Officer Curvin having some reasonable suspicion of other criminal activity. Next, he argues that his consent to search the vehicle was obtained as a direct result of the illegal detention. The State contends that the Defendant's detention was not unreasonably extended because the officer, based upon his training and experience, had specific and articulable facts giving rise to a reasonable suspicion that a crime had been committed or was about to be committed.

When reviewing the correctness of a trial court's grant or denial of a pretrial motion to suppress, an appellate court must uphold the trial court's findings of fact "unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). This standard recognizes that the credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters "entrusted to the trial judge as the trier of fact." Id. Moreover, it is settled law that the party prevailing at the trial court is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence, see State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001), and the defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court, see Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

However, this Court is not bound by the trial court's conclusions of law. See State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002). The application of the law to the facts as found by the trial court is a question of law which an appellate court reviews de novo. See State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). Because the facts presented at the suppression hearing in this case were undisputed, only questions of law are before this Court. Therefore, our review of the record before us is purely de novo. See State v. Gonzalez, 52 S.W.3d 90, 94 (Tenn. Crim. App. 2000).

Both the Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution prohibit "unreasonable searches and seizures." The intent and purpose behind these constitutionally protected rights is to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." Camara v. Mun. Court of S.F., 387 U.S. 523, 528 (1967).[5] As a general rule, warrantless searches or seizures are presumed unreasonable, and any evidence discovered thereby is subject to suppression unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to a narrowly defined exception to the warrant requirement. See Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Garcia, 123 S.W.3d 335, 343 (Tenn. 2003).

One of these narrow exceptions occurs when a police officer initiates an investigatory stop based upon specific and articulable facts that the defendant has either committed a criminal offense or is about to commit a criminal offense. Terry v. Ohio, 392 U.S. 1, 21 (1968); State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). This narrow exception has been extended to the investigatory stop of vehicles. See United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). When the police have probable cause that a traffic violation has occurred, the decision to stop the vehicle is reasonable. State v. Berrios, 235 S.W.3d 99, 105 (Tenn. 2007) (citing Whren v. United States, 517 U.S. 806, 810 (1996)). Furthermore, the reasonableness of the scope of a traffic stop is to be measured in objective terms without regard to the subjective intentions of the officer. Ohio v. Robinette, 519 U.S. 33, 38 (1996).

If an officer's action in stopping an individual is justified at its inception, then we must next determine whether the seizure and search of the individual are "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. at 20. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). "[T]he

_____

[5] The intent and purpose of the prohibitions against unreasonable searches and seizures found in the Tennessee Constitution have been found to be the same as that behind the provision found in the Fourth Amendment to the United States Constitution. See State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998).

proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998). If "the time, manner or scope of the investigation exceeds" the ambit of reasonableness, a constitutionally permissible stop may be transformed into one which violates the Fourth Amendment and article 1, section 7 of the Tennessee Constitution. United States v. Childs, 256 F.3d 559, 564 (7th Cir. 2001); see also State v. Morelock, 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992). However, "no hard-and-fast time limit exists beyond which a detention is automatically considered too long and, thereby unreasonable." State v. Justin Paul Bruce, No. E2004-02325-CCA-R3-CD, 2005 WL 2007215, at *7 (Tenn. Crim. App., Knoxville, Aug. 22, 2005); see also United States v. Sharpe, 470 U.S. 675, 685 (1985) ("[I]f an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.").

In Tennessee, "requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." State v. Gonzalo Garcia, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *21 (Tenn. Crim. App., Nashville, Feb. 20, 2002) (citations omitted), overruled on other grounds by Garcia, 123 S.W.3d 335. With this in mind, however, when an officer observes certain misdemeanors, such as a operating a vehicle in excess of the speed limit, the officer shall issue a citation for the violation in lieu of arresting the misdemeanant. See Tenn. Code Ann. §§ 55-8-152, -10-207(a)(1). "[T]he Tennessee 'cite and release' statute creates a presumptive right to be cited and released for the commission of a misdemeanor." State v. Walker, 12 S.W.3d 460, 464 (Tenn. 2000). Violating the "cite and release" statute infringes upon a person's right against an unreasonable search and seizure. Id. at 467.

After a considerable split of authority in the federal courts, the United States Supreme Court resolved the issue of whether an officer is permitted to ask questions during a search unrelated to the purpose of the initial detention in Muehler v. Mena, 544 U.S. 93, 100-01 (2005). Although the facts in Muehler were not based on a traffic stop, Muehler held that "mere police questioning does not constitute a seizure" unless it extends the detention of the individual. Id. (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)). Recently, in Arizona v. Johnson, 555 U.S. 323, 129 S. Ct. 781 (2009), the United States Supreme Court emphasized its holding in Muehler and made clear that

> [a] lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.

See Brendlin v. California, 551 U.S. 249, 258 (2007). An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. See Muehler v. Mena, 544 U.S. at 100-01.

555 U.S. ---, 129 S. Ct. at 788.

It is also well-settled that a search conducted pursuant to voluntary consent is an exception to the requirement that searches and seizures be conducted pursuant to a warrant. State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996). That is, although the Fourth Amendment and article I, section 7 of the Tennessee Constitution condemn unreasonable searches and seizures, they recognize the validity of voluntary cooperation. Florida v. Bostick, 501 U.S. at 439; see Schneckloth v. Bustamonte, 412 U.S. 218, 243 (1973) (holding that "there is nothing constitutionally suspect in a person [] voluntarily allowing a search"); see also State v. Cox, 171 S.W.3d 174, 184 (Tenn. 2005). The sufficiency and validity of consent depend largely upon the facts and circumstances presented by each particular case. State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993).

To satisfy the constitutional reasonableness standard, the consent must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" Simpson, 968 S.W.2d at 784 (quoting State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992)). Moreover, even if the consent is voluntary, evidence seized in the search will not be admissible if the initial detention was unlawful or thereafter became unreasonable and if the consent was an exploitation of the prior unlawful seizure. See Garcia, 123 S.W.3d at 346. "The existence of consent and whether it was voluntarily given are questions of fact" involving an examination of the totality of the circumstances in each case. State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983)); see State v. McCrary, 45 S.W.3d 36, 43 (Tenn. Crim. App. 2000).

In this case, Defendant concedes that the initial stop by Officer Curvin was constitutional. Officer Curvin had probable cause to stop the Defendant based on a speeding violation. See Tenn. Code Ann. § 55-8-152. The Defendant argues, however, that his continued detention and the subsequent search of the vehicle were conducted without a finding of reasonable suspicion.

Based on this record, we are unable to conclude that Officer Curvin's actions unreasonably exceeded the scope of the traffic stop. In regard to the time, manner, and scope of the traffic stop, the record shows that, on November 7, 2008, Officer Curvin, after

confirming that the Defendant was speeding, stopped the Defendant's vehicle at approximately 8:29 p.m. Although the Defendant pulled over in a "really wide place," he positioned his vehicle so that Officer Curvin was unable to approach the driver's side of the car without walking into oncoming traffic. At 8:32 p.m., upon first approaching the passenger's side of the vehicle, Officer Curvin noticed a strong odor of alcohol emanating from the vehicle. Officer Curvin noted that the Defendant seemed more nervous than what was normal for a routine traffic stop. The passenger of the car, who stated that he had been drinking, avoided eye contact with Officer Curvin, staring "strictly at the glove box." When Officer Curvin asked the Defendant about his driver's license, the Defendant provided a copy of a rental agreement for the vehicle. Officer Curvin found it strange that the vehicle was rented due to the tinted windows and the many fast food wrappers and cups inside the vehicle, which made it appear that someone was living inside the car.

Officer Curvin then returned to his patrol car to run a records check on the Defendant. While doing so, he noticed that the vehicle was due to have been returned to Enterprise Rent-A-Car that day at noon, but it was already 8:38 p.m. However, the car had not been reported as stolen and, when Officer Curvin later inquired about the car, the Defendant stated he had gotten an extension on the rental.

In order to determine if the Defendant was intoxicated, Officer Curvin walked back to the car and asked the Defendant to step outside of the vehicle. After speaking with the Defendant for a minute, Officer Curvin did not believe that the Defendant was intoxicated; however, the Defendant still appeared to be very nervous. After ascertaining the Defendant's sobriety and receiving a somewhat satisfactory explanation as to why the rental car had not been returned, Officer Curvin began writing the Defendant a ticket. Up until this point, Officer Curvin "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly[,]" see Simpson, 968 S.W.2d at 783, namely whether the Defendant was also intoxicated due to the smell of alcohol inside the vehicle and whether the rental car was stolen due to the tardiness of its return. See also State v. Brown, 294 S.W.3d 553, 562 (Tenn. 2009).

As Officer Curvin was writing the ticket, he saw that the Defendant had just gotten his license back on May 13, and the officer then made a statement to the Defendant about it. The Defendant relayed that he had just been released from lockup after failing a urine test. The Defendant appeared very anxious and ready "to get back on the road." From his experience and training, Officer Curvin believed a search to be in order based upon the suspicious behaviors of the Defendant.

The Defendant gave permission to search the car and indicated that there was no contraband inside the vehicle. However, the Defendant then tried to return to the vehicle,

and Officer Curvin stopped him. Again, Officer Curvin inquired about a weapon, and the Defendant, after a long pause in which he averted his eyes, said "no." Just to be certain, Officer Curvin again asked for consent to search the car, and the Defendant appeared extremely nervous but answered in the affirmative. Thereafter, the Defendant spontaneously stated that he did have a gun inside the car and again tried to return to the car. Officer Curvin stopped the Defendant from returning and placed him in the back of his patrol car. At 8:45 p.m., Officer Curvin called for backup, which was only eighteen minutes after he observed the Defendant speeding.

The trial court in this case found that, "for the most part, although the questions and requests for consent to search did represent an expansion of the scope of the stop, they were contemporaneous with the preparation of the citation and therefore did not prolong the stop beyond the time necessary to investigate the traffic offense." Contrary to the Defendant's citations to Simmons and Fly, we conclude that the facts of this case are more akin to those presented in Brown, 294 S.W.3d 553, and State v. Christian Fernandez, No. E2006-01781-CCA-R3-CD, 2007 WL 3072910 (Tenn. Crim. App., Knoxville, Oct. 23, 2007). Just as in Fernandez, the officer's request for consent in this case was sufficiently contemporaneous with the issuance of the citation, such that there was no appreciable delay, and certainly no unreasonable delay. See Fernandez, 2007 WL 3072910 at *6. The time, manner, and scope of Officer Curvin's investigation did not exceed the proper parameters of a traffic stop. Brown, 294 S.W.3d at 562. In addition, the Defendant voluntarily granted consent to search his vehicle. See Fernandez, 2007 WL 3072910 at *6. The Defendant was under no obligation to consent to the search, and Officer Curvin exerted no coercion or duress to force him to do so. See id. Moreover, although Officer Curvin did not remember if he informed the Defendant of his right to refuse consent to search, this Court has declined to impose such a requirement. Brown, 294 S.W.3d at 563 (citing State v. Cox, 171 S.W.3d 174, 184 (Tenn. 2005)). Once the Defendant consented, all requirements that a showing of reasonable suspicion be made were rendered unnecessary. See Fernandez, 2007 WL 3072910, at *6.

Nonetheless, the trial court found that Officer Curvin articulated several suspicious factors that amounted to reasonable suspicion to prolong the stop, e.g., the position of the Defendant's vehicle, the Defendant's nervousness and talkativeness, lack of eye contact by the passenger, the presence of fast food wrappers and cups inside the car, the expiration of the rental agreement, the Defendant's admission of a positive urine test, the Defendant's long pause when asked a second time if a gun was inside the car, the subsequent admission that there was a gun inside the car, and the recent issuance of the Defendant's driver's license after serving time in lockup. It is well established that courts should consider the totality of the circumstances to determine whether reasonable suspicion exists, including the officer's "special training in narcotics surveillance and apprehension." Florida v. Rodriguez, 469 U.S. 1, 6 (1984). We conclude that these several factors, when taken together, suffice to support

a reasonable suspicion of criminal activity sufficient to warrant expanding the scope of the traffic stop to investigate further.  See, e.g., State v. Robert Lee Hammonds, No. M2005-01352-CCA-R3-CD, 2006 WL 3431923, at *9 (Tenn. Crim. App., Nashville, Nov. 29, 2006) (finding reasonable suspicion where the officer knew defendant's reputation as a drug user in addition to the defendant's nervousness, presence in a high crime area, and lack of candor regarding his criminal history).  Because the Defendant was not unreasonably detained, his consent to search was not preceded by an illegal seizure.  He is not entitled to relief.

**Conclusion**

Based on the foregoing, the judgments of the trial court are affirmed.  We remand solely for the entry of a corrected judgment form on the possession of cocaine for resale conviction to reflect the $2,000.00 fine imposed.


_____
DAVID H. WELLES, JUDGE